## GAINES v. OGDEN RAPID TRANSIT CO.

No. 2496.   Decided May 8, 1914.   On Application for Rehearing June 8, 1914 (141 Pac. 110).

1. APPEAL AND ERROR—REVIEW—FINDINGS. When supported by substantial evidence, a verdict will not be disturbed on appeal. (Page 513.)

2. CARRIERS—CARRIAGE OF PASSENGERS—ACTIONS—EVIDENCE—SUFFICIENCY. Evidence, in an action by a passenger injured in attempting to alight from a slowly moving street car in accordance with the conductor's suggestion, held sufficient to support a finding that the carrier was negligent. (Page 513.)

3. CARRIERS — CARRIAGE OF PASSENGERS — ACTIONS — CONTRIBUTORY NEGLIGENCE. Where a passenger on a street car, which he thought would follow one route, upon discovering that it had turned off, requested a transfer from the conductor so that he could catch a car following, and the conductor said that he could get off as the car was moving slowly, the passenger's attempt to alight in accordance with the suggestion of the conductor is not contributory negligence as a matter of law.[1]   (Page 517.)

4. CARRIERS—CARRIAGE OF PASSENGERS—ACTIONS—EVIDENCE—SUFFICIENCY. In an action by a passenger hurt in attempting to alight from a moving car, evidence held sufficient to sustain a finding that the accident was caused by the carrier's negligence, and not the passenger's attempt to alight from the car while it was in motion.   (Page 519.)

McCARTY, C. J., dissenting.

---

[1] Paul v. Railroad, 30 Utah, 30, 83 Pac. 564.

APPEAL from District Court, Second District; *Hon. J. A. Howell,* Judge.

Action by James T. Gaines against the Ogden Rapid Transit Company.

Judgment for plaintiff. Defendant appeals.

AFFIRMED.

*Boyd, De Vine* and *Eccles* for appellant.

*Halverson* and *Pratt* for respondent.

FRICK, J.

The plaintiff, respondent here, brought this action against the defendant, appellant in this court, to recover damages for personal injuries which it is alleged he suffered while a passenger on one of appellant's street cars through its negligence. The appellant denied negligence on its part, and pleaded contributory negligence on the part of respondent. A trial to a jury resulted in a verdict in favor of respondent, upon which judgment was duly entered, to reverse which this appeal is prosecuted.

The controlling facts, in substance, are: That on the 6th day of June, 1911, the respondent was engaged in the saloon business in Ogden, Utah, and usually closed his saloon at midnight, and immediately after doing so he usually boarded one of appellant's cars at the Union Depot, which car was making its last trip for the night, and would thus go to the car barn, about two blocks from respondent's **1, 2** home, which distance he usually walked after reaching the car barn upon the car aforesaid. On the night in question respondent closed his saloon at midnight and went to the Union Depot and there boarded one of appellant's cars, which he supposed was going to the car barn as usual. After the car had proceeded east for some distance, it turned

44 Utah 33

north on Washington Avenue toward the car barn, but when it arrived at a certain street corner, instead of continuing north toward the car barn, the car turned east again to go upon what is called "the hill" or "the bench." When the car turned up the hill, the respondent at once spoke to the conductor, who was on the rear platform of the car. Respondent said: "If you are going to make another trip on the bench give me a transfer and I will catch the Washington Avenue car right back of us. He (the conductor) said, 'All right.' " The car in the meantime was proceeding up grade, and, as the respondent puts it, was "picking up a little speed right along," but going at a "slow rate of speed." The conductor prepared and gave respondent the transfer, and, when handing it to him, said: "You will have to hurry now or you won't get the Washington Avenue car." Respondent then asked the conductor: "Aren't you going to slow up so a fellow can get off?" The conductor answered: "This car isn't going very fast; you can make it all right." It seems the Washington Avenue car spoken of was following immediately behind the car respondent was on. The Washington Avenue car, it seems, was going north toward the car barn, and for that reason appellant wanted a transfer to take that car; all of which the conductor knew. There was a doctor with the respondent at the time who saw all that happened, and apparently heard all that was said, and, as he seems to be a disinterested witness, we shall state what happened as he saw it in his own words. He testified:

"Q. Will you describe what you saw and heard just as the car was leaving Washington avenue? A. Well, as we started out, Mr. Gaines (respondent) got on the rear end. As we went around the curve he said to the conductor, 'I thought this car was going to the barn,' and the conductor said, 'No; it is not; not this trip.' Well, he (respondent) said, 'Give me a transfer and I'll catch the Washington Avenue car,' and at the same time the car kept on going, and Mr. Gaines got down, and it was going up the hill, and while he was standing there, the conductor was punching the transfer, and he (respondent) says, 'Aren't you going to slow

down to let me off?' He (the conductor) said, 'We are not running fast; you can make it,' and gave him (the motorman) one bell as we started out. He got up around the curve a little ways, and he (respondent) asked him (the conductor) again if he was going to stop, and he reached up and pulled the cord, and the motorman shut off the current, and about the same time turned it on again, and Mr. Gaines went off his feet off the step onto his head. ˙. . . He (the conductor) sounded one bell just before he handed him (respondent) the transfer. He sounded two just as he handed him the transfer."

The witness also said that at the time the bell signals were given respondent was standing on the "bottom step" of the car and that the bells were given "one right after the other." The witness further said "the car gave a lurch," and the respondent got off "when the lurch came."

The respondent testified:

"Well, when I got the transfer and he (the conductor) said it wasn't going very fast, that I could make it all right I made my step for the ground. Just as I was going to make the step, the conductor gave the motorman a couple of bells, and as I was going to make the step I could feel the car jerk from under me like. . . . Well, it kind of overset my balance as I was going to step. Q. Just describe that jerk or lunge of the car when you fell. A. Well, of course, the car was moving along slowly, and then this lunge came and kind of threw me off my balance as I was getting off the step."

It also appeared that, in the judgment of the respondent, the car at the time was moving about five or six miles an hour.

The motorman testified that the car was moving about five miles an hour; that one bell was a signal to stop the car and two bells was an order to go ahead; that in going up the hill at the time in question one bell was sounded, which was immediately followed by two bells; that, although one bell was a signal to stop the car, yet his orders were not to stop the car between stopping places, but to proceed notwithstand-

ing one bell was sounded; that he was a student operator at the time, and had only been operating the car for a few days, and when one bell was sounded he did not at once recall his orders in the premises, so he attempted to obey the signal, and in doing so threw off the current, but immediately after having done so, and at about the time of the second bell, he remembered his orders, and turned the current on again; that turning off the current caused the car in moving up the hill to slacken speed, while in turning it on again it caused the car to move forward with more or less of a quick movement, as the witness put it, with "more or less of a jerk, I don't know how much."

It also appeared from the respondent's evidence that the street was dark at the point where he attempted to alight. Some of the witnesses also testified that the car had reached a point "approximately seventy-five feet" from the preceding "stopping place" when respondent got off the car.

The testimony of the conductor and other witnesses who testified on behalf of the appellant in some respects conflicted with that of respondent and the doctor. In view that we are prohibited from passing upon the weight of the evidence or the credibility of the witnesses, it would be useless for us to set forth the evidence further. We have set forth some of the evidence produced on behalf of respondent for the sole purpose of showing that there is substantial evidence in support of the verdict and judgment. Such being the case, we may not interfere with the finding of the jury. For the reason just stated, we shall not pause to discuss the question of negligence on the part of appellant. In our opinion, in view of all the evidence, the question was clearly one of fact for the jury.

Counsel, however, also strenuously insist that, although we shall hold that the question of appellant's negligence was for the jury, yet, in view that respondent alighted from the car at a time when it was moving about five or six miles an hour and in the darkness of the night, his conduct constituted negligence *per se*—that is, negligence as a matter of law—and therefore the court erred in submitting that ques-

tion to the jury. We have been referred to some cases which seem to support counsel's contention. Quite a number of the cases cited, however, refer to instances where passengers alighted from steam railroad trains while in motion. There are a few, however, which refer to street car accidents to passengers who alighted from the cars while in motion. It is now well settled, we think, that the courts do not enforce the rule with respect to going upon or alighting from street cars while in motion with the same degree of strictness that it is enforced with respect to going upon or alighting from steam railroad trains while in motion. See, on this point, Booth on Street Railways, section 336. Moreover, the great weight of modern authority is to the effect that, unless the speed of the street car is such that no prudent and careful person would attempt to board it or alight from it, the question of whether it is negligence on the part of the passenger to do so is ordinarily one of fact for the jury, to be determined from all the facts and circumstances surrounding the passenger at the time. This court is committed to that doctrine. In *Paul v. Railroad,* 30 Utah, at page 47, 83 Pac. at page 564, in referring to an instruction which was excepted to by the passenger, Mr. Justice Straup states the rule applicable to a street car in motion thus:

"Appellant cannot complain of paragraph five as far as it went, but it did not go far enough. The defendant [street car company] would not only be liable under the facts therein stated, but likewise would be liable if, the car having slowed down in response to her notice of a desire to leave the same, plaintiff attempted to alight, and the speed and the surrounding conditions were such that the jury found it was not negligence to do so, and, while making such effort to alight, the speed of the car was suddenly increased, by reason whereof she was thrown, and injured. Under the facts in the case, it was not only the province of the jury to determine whether the act of the plaintiff in attempting to alight was the proximate cause of the injury, but also to determine whether it was an act of negligence."

Nellis in his work on Street Railroad Accident Law, p. 190, says:

"If a passenger attempts to leave a moving car running at a high rate of speed, the attempt will be so obviously dangerous that he cannot recover for an injury occasioned thereby. It cannot be said, however, as a matter of law, that it is negligent to alight from a moving car or to board it while in motion. The circumstances attending the act and the speed of the car make it a question of fact for the jury."

As pointed out by the Supreme Court of Nebraska in *Bendekovich v. Omaha & C. B. St. R. Co.*, 80 Neb. 174, 113 N. W. 988, in this day of universal street car travel there are thousands of instances in every large city every day where men go upon and alight from street cars while in motion, and therefore to say that the act of doing so "is at all times and in all circumstances negligence *per se*, or in law, would be to say that a universal custom of intelligent and prudent men is such, and, as it seems to us, would be to utter an absurdity." It is accordingly held in that case that whether a passenger is negligent or not in alighting from a moving car where the speed is not such as to make the attempt almost reckless is ordinarily a question for the jury.

In a note to the case of *Heinze v. Interurban R. Co.*, 21 L. R. A. (N. S.) 715, the editor sums up the result of the decisions in the following words:

"The great weight of authority supports the proposition that for a street car passenger to go upon the platform or step of the car' for the purpose of alighting, after he has requested the conductor to stop the car, or the latter has signaled it to stop, and the speed of the car has begun to decrease, is not such negligence as will preclude a recovery for injuries sustained by being thrown from his position by some negligent act of those operating the car. Under such circumstances, therefore, the question of the passenger's negligence is for the jury."

● The Supreme Court of Alabama, in *Watkins v. Birmingham Ry. & El. Co.*, 120 Ala. 151, 24 South. 394, 43 L. R. A. 299, states the rule as follows:

"While there are some cases which hold that the act of the passenger in voluntarily leaving a car while it is in motion constitutes contributory negligence, the better doctrine, and that sustained by the great weight of authority, is that such conduct on the part

of the passenger is not negligence *per se*. There may be, it is true, exceptional circumstances attending the attempt thus to alight, such as the great speed of the train, the age or infirmity of the passenger, or his being incumbered with bundles or children, or other facts which render the attempt so obviously dangerous that the court may, where the testimony is undisputed, declare, as a matter of law, that the passenger's conduct was reckless and negligent. But ordinarily it is for the jury to say whether he acted as a reasonably cautious and prudent man would act under like circumstances."

But we refrain from quoting further. The following authorities, among others, will be found to support the foregoing statements: Booth on Street Railways, section 337; *Babcock v. Los Angeles Tr. Co.,* 128 Cal. 173, 60 Pac. 780; *Wyatt v. Citizens' Ry. Co.,* 62 Mo. 408; *Cronan v. Crescent City Ry. Co.,* 49 La. Ann. 65, 21 South. 163; *Springfield Consol. Ry. Co. v. Hoeffner,* 175 Ill. 634, 51 N. E. 884.

According to the testimony of the respondent, the doctor, and the motorman, the car made a sudden "lurch" or "jerk." This occurred at the very moment respondent was in the act of alighting therefrom. It seems to us that the jurors were thus justified in finding that respondent's fall was caused by the sudden "lurching" or "jerking" of the car, and that he could have alighted therefrom in safety had the car merely moved forward in the regular and ordinary way, although it was moving at the rate of speed testified to by the witnesses. The jury thus could have found, in case they found against appellant, that respondent was caused to fall from the car by reason of the sudden "lurch" or "jerk." In other words, that it was appellant's act in operating the car that caused respondent to fall, and not his act in making the attempt or in alighting from the car while in motion. In arriving at the foregoing conclusion, we are not unmindful of appellant's theory that it was respondent's act in alighting from the car while in motion, and not the "lurch" or "jerk" of the car, that must be looked to as the real or proximate cause of respondents fall. Counsel, in their brief, in speaking of respondent's conduct in alighting from the car, say:

"His mind was made up. His purpose was set. His acts indicated his definite intention to carry out his purpose. The jerk of the car was but an incident that occurred in the course of his risky, dangerous, and improper purpose or intention."

We cannot agree with counsel's conclusions that it was respondent's intention to alight, which is the controlling factor in producing the accident. Let it be conceded that respondent had fully made up his mind to alight from the car while it was moving along up the hill at the rate of speed testified to. It, however, does not at all follow that, if he had alighted from the car while moving in that manner and without the sudden "lurch" or "jerk," he would not have alighted in perfect safety. That is one of the elements in the case upon which reasonable minds may well differ. The respondent, in attempting to alight from the car, had a right to assume that appellant would do nothing which would increase the hazard, if any, of alighting therefrom. If, therefore, it was not dangerous *per se,* or negligent as matter of law, to attempt to alight from the car when it was moving along regularly, the jury had a right to find that it was the sudden "jerk" or "lunch" of the car that caused respondent to fall, and not the mere regular movement forward. Appellant thus greatly increased, if it did not exclusively produce, the hazard of alighting, which respondent was not bound to anticipate. Indeed, the jury were justified in finding that, although respondent attempted to alight from the moving car, yet his falling to the ground was entirely due to appellants unexpected act of causing the car to "lurch" or "jerk." Respondent's intention was thus not the controlling factor, as contended for by appellant. In this connection it should not be overlooked that this case is not an ordinary case where a passenger attempts to alight from a moving car after it had passed the usual stopping place. In this case the car, contrary to the expectations of the passenger, changed its usual course, and, instead of proceeding to the car barn, turned up the hill. Just as soon as the passenger discovered the fact, he at once spoke to the conductor who was in charge

of the car, and the conductor understood the precise situation the passenger was in, and that he desired to board the car which followed the one he was on. The conductor assented to all the passenger did, but, instead of arresting the speed of the car to permit the passenger to alight, the conductor encouraged the passenger to do so while the car was in motion, and practically advised him that it was safe to do so. In view of all the circumstances, therefore, the question of negligence was one peculiarly within the province of the jury, and not within that of the court.

Nor can appellant's objections urged to the charge of the court be sustained. While it is true that the charge contains some repetitions of the statements made by some of respondent's witnesses, and also contains some repetitions of other matters, yet no attempt whatever was made by the court to invade the province of the jury. Indeed, some of the repetitions clearly indicate that they were made for the express purpose of not doing so. The charge covers every phase of the case, and, after a very careful scrutiny, we find nothing which could have misled the jury, nor anything by which they were misdirected with respect to the law applicable to the evidence adduced. Nor did the court commit any prejudicial error in refusing any of the requests offered by appellant.

The judgment is therefore affirmed, with costs.

STRAUP, J., concurs.

McCARTY, C. J.

I dissent. As I view the facts and understand the principles of law applicable thereto, the judgment in this case cannot be upheld because: (1) The evidence wholly fails to show negligence on the part of appellant company; and (2) because the evidence as a whole, and respondent's testimony in particular, shows that he was guilty of contributory negligence of the most reckless character. The negligence alleged in the complaint is that:

"Plaintiff attempted to get off said car, but, while he was so doing, the defendant, through its servants so negligently and carelessly managed and operated said car that said car suddenly moved forward with a jerk and accelerated speed, thereby throwing the plaintiff violently to the ground."

The facts and circumstances leading up to and which culminated in the accident complained of, briefly stated, are as follows:

Respondent, on the night in question, boarded the Twenty-Second Street car and paid the usual fare. When the car arrived at the switch on Washington Avenue about forty feet south of the center of the intersection of Washington Avenue and Twenty-Second Street it was stopped for the purpose of letting off and taking on passengers. Immediately after passing the switch the car turned east on Twenty-Second Street. As to what occurred from the time the car started on the curve until the happening of the accident complained of, respondent testified in part as follows:

"I was sitting on the rear seat on the left-hand side of the car, and as soon as they pulled off the main line I immediately stepped back on the platform and said (to the conductor), 'if you are going to make another trip on the bench give me a transfer and I will get the Washington Avenue car right back of us.' He said, 'All right.' While this conversation was going on, and he was preparing the transfer, it was still moving upgrade, . . . picking up speed right along there, but going at a slow rate of speed, . . . possibly running five or six miles an hour. . . . I was ready to step off when he gave me the transfer, and he said, when he gave it to me, 'You will have to hurry now, or you won't get that Washington Avenue car;' and as soon as he handed me the transfer I said, 'Aren't you going to slow up so a fellow can get off?' So he said, 'This car isn't going very fast; you can make it all right.' . . . I made a step for the ground. Just as I went to make the step the conductor gave the motorman a couple of bells, and I could feel the car jerk from under me like. It kind of overset my balance as I was going to step. The car was moving along

slow, and then this lurch kind of threw me off my balance as I was getting off the step. . . . I had noticed signs on the vestibule of the cars about entering and leaving cars, and along with it a sign, 'Don't leave or enter the car while in motion.' "

Dr. H. R. Higgins, a witness for respondent, testified:

"The conductor sounded one bell just before he handed him (respondent) the transfer, and two just as he handed him the transfer. They were given one right after the other, not much different between the time. . . . There was a sudden jerk of the car. The jolt was after the bells, if I remember. The car was running all the time from the time it left Washington Avenue."

J. M. Jensen, the motorman operating the car, but who, at the time of the trial, had left the employ of appellant, was called as a witness by respondent, and testified:

"We stopped at Twenty-Second Street before we went on the curve. When we got started up the straight track we were going about five or six miles an hour, and gradually picked up speed; . . . that is the usual way of running the car up the hill. . . . The next regular stop was in the middle of the block. . . . After I left Washington Avenue I got one bell. It ordinarily means a stop at the next regular stopping place. I didn't understand this at first, but I did on second thought. . . . I started to turn off the power, and turned it on again. Then I heard three bells, which is the emergency stop. . . . I didn't have all the current on when I heard the bell. . . . I just turned the current off and on in about half a second. As soon as the current is turned off the car would kind of slow down, and to turn it on again would start it with more or less of a jerk; I don't know how much. If there was a lurch or jerk I did not notice it at all. . . . At the time I received the emergency (signal) I would say I was going at a speed of five or six miles an hour."

Eight witnesses other than respondent, six of whom were passengers on the car in question at the time of the accident, testified in the case. Respondent and Dr. Higgins are the

only two witnesses who observed or felt the "jerk" or "lurch" of the car, and their testimony does not show, or tend to show, that the movement of the car on that occasion was anything unusual or out of the ordinary in the operation of street cars up, over, and down the heavy grades so common in the street car tracks in this intermountain country. Five of the witnesses, three of whom were standing in the rear vestibule of the car and heard what was said by the conductor and respondent, and saw all that transpired at the rear end of the car on that occasion, testified that they neither observed nor felt the jerk or lurch of the car. This evidence is not in conflict nor inconsistent with the testimony of respondent and that given by Dr. Higgins on this point, and, while it is in the nature of negative testimony it nevertheless shows that the "jerk" or "lurch" of the car was very slight, and of such a character as not to endanger or inconvenience the passengers seated in the car or standing in the vestibule thereof. Respondent, in his testimony on this point, said:

"He (the motorman) turned on a little more speed. Q. After he had said that (referring to the foregoing statements attributed to the conductor) how far would you say the car traveled before you started to step off or were thrown off? A. Perhaps a couple or three feet. . . . Q. You were down on the second step by that time and ready to swing off? A. Ready to step off on the ground, by leap. Q. About that time you say there was a lurch? A. Yes, sir. Q. Just describe . . . the strength of it, or the force of it. A. Well, when anything is traveling along at a slow rate of speed and then gives a little kind of jerk it kind of throws a fellow off his balance quicker than if it was standing still."

Assuming for the sake of the argument that there is sufficient evidence of negligence on the part of appellant to justify the submission of that question to the jury, yet the contributory negligence of respondent was so glaring as I read the evidence, that the judgment ought not to be upheld. At the time of the accident respondent was in the prime of life (forty-three years of age), and he testified that he never

felt better in his life, and was never "in finer mental condition than that night." He also testified that he was familiar with the printed rule of appellant company which was conspicuously displayed upon its cars as a guidance and warning to all passengers riding thereon; which rule was as follows: "Do not enter or leave cars while in motion." When the accident occurred the car was about midway between two stopping places and going at the rate of about five or six miles an hour. Respondent knew, or at least he was given to understand, that the car would neither stop nor "slow up" for him to alight before it arrived at the next regular stopping place. He testified:

"When he (the conductor) handed me the transfer . . . I said, 'Aren't you going to slow up?' He said, 'This car ain't going very fast; you can make it all right.' "

On cross-examination, he testified:

"The conductor said, 'This car ain't going very fast; I think you can make it all right.' Q. All this time the car was going along? A. Going along. Q. And gradually increasing in speed. . . . A. Yes, sir."

He also testified that it was "awful dark" at the point where he alighted from the car, and, further, that:

"Just before I started to get off, the conductor gave two bells which means go ahead, speed up. . . . The conductor did not say it was going to stop and instead gave the signal for more speed."

Counsel for respondent, in the discussion of the case in their printed brief, seem to attach considerable importance to the remark made by the conductor as he handed respondent the transfer. Respondent's act in getting off the car between regular stopping places, while it was in motion, and at a point where he says it was "awful dark," cannot be justified or excused because of what the conductor said. These remarks were not in any sense an order, direction, or invitation for respondent to get off the car. At most, they can only be construed as a suggestion or expression of opinion that respondent might safely alight from the car. The record shows that respondent was as capable of deciding as

to whether he could, under the circumstances, alight with safety as was the conductor. Furthermore, the record shows that he had fully decided on getting off the car while it was in motion and before the statements referred to were made. On this point respondent testified in part as follows:

"He reached in his pocket and got his punchers and his book, and by the time he got the transfer ready for me . . . I was ready to get off. Q. What had you done in the meantime? A. I had gotten around to the step waiting to get the transfer."

I think it clearly appears that respondent, in getting off the car at the time and place he did, was guided solely by his own judgment, and was not influenced in what he did by any act or word of the conductor. Respondent nowhere in his testimony claims or even suggests, that he was induced to alight from the car on that occasion by anything that was said or done by the employees of the railway company.

The degree of care required of carriers in conveying passengers is well stated by Mr. Justice Straup in *Paul v. Railroad*, 30 Utah, 41, as follows:

"The carrier is required to exercise 'the highest degree of care, prudence, and foresight consistent with the practical operation of its road, or, as it is sometimes expressed, the utmost skill, diligence, care, and foresight consistent with the business, in view of the instrumentalities employed, and the dangers naturally to be apprehended, and the carrier is held responsible for the slightest neglect against which such skill, diligence, care, and foresight might have guarded.' "

And the general rule, as declared by the great weight of authority, seems to be that the question of whether it is negligence for a passenger to alight from a moving street car is ordinarily a matter for the jury to determine. Most of the cases cited by counsel involve the question of negligence where the accident happens at regular depots or stopping places where the car had either stopped or was slowing down as it approached the stopping place. In this case, however, the accident happened just after the car had left a regular stopping place, was in motion, gradually increasing its speed,

and at a point midway between stations, where, as testified to by respondent, it was "awful dark." It seems to me that the affirmance of the judgment in this case makes the carrier an insurer regardless of the negligence of the passenger, which, of course, is not the law.

ON APPLICATION FOR REHEARING.

FRICK, J.

Counsel for appellant have filed a petition for a rehearing, in support of which it is most strenuously contended that we have misconceived the law and misstated the facts to the prejudice of appellant. Counsel, in referring to the decision, say:

"We submit that . . . the sweeping enlargement of the real principle involved . . . justifies your reconsideration before ultimately establishing a doctrine so extreme as has been declared here."

We are also told that:

"The public should not be instructed by judicial decision that even on a street car system they can, at any time or place, and between stopping places, leave, or have the right to leave, a moving car, and, if injured in the attempt, allow a jury to pass on whether such an act is negligent."

It is further said:

"It (the doctrine laid down in the decision) cannot be sustained except upon the theory that this court is creating an entirely new legal doctrine as to the relative rights and duties of carriers and passengers."

There is much more said to the same effect, but the foregoing is quite sufficient to show the trend of counsel's contentions.

With regard to the facts, it is said that we misstated them, in that we made the statement that the car had only reached a point approximately seventy-five feet distant from the preceding stopping place when the accident occurred. We did say in the opinion that some of the witnesses did testify that the car had approximately reached that distance from the

preceding stopping place "when respondent got off the car."
It is quite possible that we were mistaken, and that the car
had proceeded farther than that distance from the preceding
stopping place. We, however, made the statement in good
faith and from what appellant's counsel had said on page
six of their printed brief filed in the case. They, in re-
ferring to the place where the street car was at the time of
the accident, said:

"It was going up a stiff grade; it was gradually increas-
ing speed all the time. From striking the curve at Washing-
ton Avenue, or a distance from the last stopping place ap-
proximately seventy-five feet, it had increased until at the
time of the accident it was proceeding at five to six miles an
hour."

Now, we may have misapprehended the precise meaning
of the foregoing statement, and, in making the statement
with regard to distance, may have given it less than it ac-
tually was. This, however, is the only matter of fact that
is, or could be, contended was misstated. Whether the car
had proceeded seventy-five or one hundred feet, or one hun-
dred and fifty, is, however, entirely immaterial. Moreover,
the distance the car had actually traveled was a mere esti-
mate or guess on the part of the witnesses. That the precise
distance the car had proceeded was deemed irrelevant is so
apparent from what is said in the opinion that it is unneces-
sary to discuss the question at length. It must suffice to say
that the statement may be entirely eliminated from the opin-
ion, or disregarded, and the result reached would still be the
same.

As to whether counsel's contentions with respect to the
law have any merit, must in a large measure, be determined
from what is said in the opinion itself. If refusing to de-
termine, as matter of law, the questions of negligence and
contributory negligence under circumstances like those in
this case constitutes a "sweeping enlargement" of the "prin-
ciple" involved in negligence cases, then have we erred in
the conclusion reached. It is, however, contended that we
have injected a "new issue" into the case, for the reason that

we said the jerking or sudden movement of the car, which was due to the conductor's signals, and which occurred at the moment respondent was about to alight from the car, constituted an increased hazard which respondent was not required to expect. In view of what counsel said in their original brief upon that subject, which, to be perfectly fair to them, we quoted in the opinion, and in view that the conduct of appellant in that regard was alleged in the complaint as an element of negligence, and in further view that we stated the testimony of the witnesses upon that point in their own language, the contention that we "raised a new issue" seems a little strange. True, counsel complained that the trial court had erred in its charge because it several times repeated to the jury what the conductor had said to respondent just before the accident. It is also true that, while the court did repeat what the conductor said, it did not repeat nor refer to the evidence with regard to the jerking of the car, but no one can seriously contend that for that reason the question was not involved. Indeed, it was one of the elements of negligence relied on by respondent's counsel at every step. Moreover, it was argued in the printed briefs of counsel for both sides, and was again orally argued at the hearing. What counsel mean, no doubt, is that, in view that the court did not specially call the jury's attention to the jerking of the car as it had done to what the conductor had said therefore the so-called "increased hazard" in alighting from the car was not before them for consideration. The court, however, submitted all the evidence to the jury, as it was bound to do in submitting the case to them. The conduct of the conductor and all that occurred at and immediately preceding the accident was therefore a part of the case, and the jury was bound to consider all the facts, and so were we. It may not be improper to state that every observation contained in the opinion with respect to the effect that the sudden movement or jerking of the car may have had upon the respondent at the moment he was about to alight was made after mature reflection. We arrived at the con-

44 Utah 34

clusion that, if the conductor had not said anything to the
respondent, but by his acts and conduct had encouraged him
to alight, as the evidence discloses he did, the questions of
negligence and contributory negligence would still have been
for the jury to determine as matters of fact.  In order to
avoid confusion with respect to the precise scope of our
decision, therefore, we decided not to base it alone upon
what the conductor had said, but upon all that was said and
what occurred at the time.  The "increased hazard" spoken
of in the opinion occasioned by the sudden movement or
jerking of the car was always a factor in the case, whether
expressed by one term or by another, or whether not ex-
pressed at all.  Counsel's contentions with respect to a new
issue, therefore, are, in one sense, a mere play upon words.
Speaking for myself alone, I must confess that I have at no
time considered this case a close one upon the question of
whether the alleged negligence was one of fact or law.  To
my mind there are many features that differentiate this case
from one assumed by counsel where a passenger attempts to
alight from a moving car after it has passed a regular stop-
ping place.  Counsel's zeal may be sufficient justification for
their contention that all there is involved here is an injury
to a passenger who alighted from a moving car after it had
passed beyond a regular stopping place.  We, however, can-
not shield ourselves behind such a frail barrier.  We owe
no duty to a client which may cause us to lose sight of a
material factor in the case.  We are not dealing with an
ordinary case of a passenger alighting from a moving car, as
counsel constantly insist.  We have a case where a passenger
at midnight boards what he thinks to be the last car for the
night to reach his home.  The car, however, without warning
to him, suddenly changes its usual course, and, instead of
carrying him towards his home, would take him in another
direction.  He, however, sees that another car is following
the one he is on which will take him to his home.  He im-
mediately speaks to the conductor of the car upon which he
is riding and advises him of the predicament.  The conduc-
tor, instead of stopping or slowing down the speed of the

car, either of which he could have easily done, to permit the passenger to alight, gives him a transfer, and admonishes him to make haste or he will also miss the car which follows the one he is on, and even encourages the passenger to alight from the moving car, by telling him that it is not moving or "running fast, you can make it." Then, when the passenger is in the very act of alighting for the purpose of catching the car which is following, all of which the conductor sees, he gives certain signals which are misinterpreted by the motorman on the car, and, in view that the car is proceeding up a "stiff grade," the sudden turning off and on again of the current causes the car to jerk, in consequence of which as the jury must have found, the passenger is thrown to the ground and is injured. To say that, under such facts and circumstances, the question of either negligence or contributory negligence is one of law would, in my judgment, amount to a total disregard of the rule by which courts ordinarily determine when a question is one of law and when it is one of fact.

Finally, counsel insist that their client has been unjustly condemned, and in that connection they make the following appeal:

"If it be our fate to lose—that is, if we are to be condemned—then we certainly feel that we should be executed in the ordinary, usual, and prescribed manner; and that no new or hitherto unknown methods of execution be created."

This somewhat pathetic appeal might perhaps have been properly addressed to the jurors, who had the power to save counsel's client from "execution." To us it was made in vain. When counsel brought their client to this court the "execution" had already taken place. In order to afford any relief in that regard, we must needs possess the power of resurrection—of breathing new life into the dead. We possess no such power. All that we are empowered to do is to scrutinize the record for the purpose of determining whether the so-called condemnation has been effected in accordance with law. Notwithstanding counsel's protests, we are fully convinced that the verdict of the jury is sustained by the

evidence; that the judgment conforms to the law; and that no new and "hitherto unknown methods" were invoked in this case.

The petition for a rehearing is therefore denied.

STRAUP, J., concurs.

McCARTY, C. J.

In view of the able and elaborate briefs filed by counsel herein, I am not in favor of reopening the case for further argument, but am of the opinion that the case should be reconsidered by this court, and a different result reached from the one heretofore announced.